**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| *In re Apple AirTag Marketing, Sales Practices, and Products Liability Litigation* | MDL No. 3199 |

**DEFENDANT APPLE INC.'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407 FOR CONSOLIDATED OR COORDINATED PRETRIAL PROCEEDINGS**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 3

A. Apple Introduced AirTag with Industry-First Safety Features .......... 3

B. Plaintiffs Allege Widely Varied Experiences with AirTag and Third Parties .......... 4

C. Most Plaintiffs' Claims Have Been Litigated for More than Three Years .......... 4

ARGUMENT .......... 6

I. The Panel Should Decline to Centralize These Actions. .......... 7

A. Most of the Remaining Issues Are Case-Specific .......... 7

1. The Remaining Fact Discovery Is Largely Case-Specific .......... 7

2. Nearly Every Case Will Entail Application of a Different Legal Framework .......... 10

B. To the Extent Common Discovery Remains, Informal Coordination Can Achieve the Benefits of Centralization Without the Accompanying Costs. .......... 13

C. Centralization Would Risk the Progress Already Made Toward Resolution and Create Inefficiencies Stemming from Differing Procedural Postures. .......... 16

II. If the Panel Orders Centralization, It Should Centralize the Cases in the Middle District of Florida. .......... 18

CONCLUSION .......... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adamo v. Brown & Williamson Tobacco Corp.*,
900 N.E.2d 966 (N.Y. 2008) ... 11

*Avila v. Ford Motor Co.*,
680 F. Supp. 3d 1125 (N.D. Cal. 2023) ... 9

*In re Best Buy Co., Inc., Calif. Song-Beverly Credit Card Act Litig.*,
804 F. Supp. 2d 1376 (J.P.M.L. 2011) ... 3, 6, 13, 16

*In re BPS Direct, LLC, and Cabela's, LLC, Wiretapping Litig.*,
677 F. Supp. 3d 1363 (J.P.M.L. 2023) ... 19

*In re Brandywine Commc'ns Techs., LLC, Patent Litig.*,
959 F. Supp. 2d 1377 (J.P.M.L. 2013) ... 17

*In re California Wine Inorganic Arsenic Levels Products Liability Litigation*,
109 F. Supp. 3d 1362 (J.P.M.L. 2015) ... 15

*In re The Church of Jesus Christ of Latter-day Saints Sexual Abuse Litig.*,
776 F. Supp. 3d 1356 (J.P.M.L. 2025) ... 10

*In re Cincinnati Insurance Co. COVID-19 Bus. Interruption Protection Ins. Litig.*,
492 F. Supp. 3d 1347 (J.P.M.L. 2020) ... 10, 13

*In re CVS Caremark Corp. Wage & Hour Employment Practices Litig.*,
684 F. Supp. 2d 1377 (J.P.M.L. 2010) ... 11

*In re Cymbalta Prods. Liab. Litig.*,
65 F. Supp. 3d 1393 (J.P.M.L. 2014) ... 8, 14, 15, 16

*Doe v. Apple Inc.*,
No. 2:26-cv-2178-ART-EJY (D. Nev.) ... 8

*Doe v. Apple Inc.*,
No. 2:26-cv-04252-SJB-JMW (E.D.N.Y.) ... 8

*Doe M.S. 1 v. Apple Inc.*,
3:26-cv-00262-PDW-ARS (D.N.D.) ... 19

*Doe S.B. 1 v. Apple Inc.*,
No. 2:26-cv-05421-PHX-SPL (D. Ariz.) ... 19

*Doe v. Apple Inc.*,
No. 2:26-cv-05261-PHX-DJH (D. Ariz) ....................19

*Ferens v. John Deere Co.*,
494 U.S. 516 (1990)....................12

*Ford Motor Co. v. Trejo*,
133 Nev. 520 (2017) ....................11

*In re Gerber Probiotic Products Marketing & Sales Practices Litigation*,
899 F. Supp. 2d 1378 (J.P.M.L. 2012)....................18

*In re Hartford COVID-19 Bus. Interruption Protection Ins. Litig.*,
493 F. Supp. 3d 1358 (J.P.M.L. 2020)....................10

*In re Harvest Entities Fair Labor Standards Act (FLSA) & Wage & Hour Litigation*,
584 F. Supp. 3d 1380 (J.P.M.L. 2022) ....................14

*In re Hotel Indus. Sex Trafficking Litig.*,
433 F. Supp. 3d 1353 (J.P.M.L. 2020)....................15

*Hughes v. Apple Inc.*,
2024 WL 4828072 (N.D. Cal.) ....................5, 8, 12

*Hughes v. Apple Inc.*,
No. 3:22-cv-07668-VC (N.D. Cal.) ....................2, 5, 12

*In re Lloyds Bank plc Int'l Mortg. Serv. Loan Litig.*,
997 F. Supp. 2d 1352 (J.P.M.L. 2014)....................16

*Jones v. NordicTrack, Inc.*,
550 S.E.2d 101 (Ga. 2001)....................11

*Lee v. State Farm Mut. Ins. Co.*,
272 Ga. 583 (2000) ....................11

*Leon v. Cont'l AG*,
301 F. Supp. 3d 1203 (S.D. Fla. 2017) ....................11

*Lexecon Inc. v. Milberg Weiss*,
523 U.S. 26 (1998)....................13

*McCann v. Foster Wheeler LLC*,
48 Cal. 4th 68 (2010) ....................12

*Naples v. Stefanelli*,
972 F. Supp. 2d 373 (E.D.N.Y. 2013) ....................11

*Nedlloyd Lines B.V. v. Superior Court*,
3 Cal. 4th 459 (1992) ....................12

*In re Range View Mgmt., LLC TCPA Litig.*,
753 F. Supp. 3d 1375 (J.P.M.L. 2024)....................7

*In re Rhone-Poulenc Rorer Inc.*,
51 F.3d 1293 (7th Cir. 1995) ....................11

*SCI Texas Funeral Services, Inc. v. Nelson*,
540 S.W.3d 539 (Tex. 2018)....................11

*Scoma Chiropractic, P.A. v. Dental Equities, LLC*,
No. 2:16-cv-41-JLB-MRM ....................18

*In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Products Liability Litig.*, 249 F. Supp. 3d 1348 (J.P.M.L. 2017) ....................18

*In re Student Athlete Name & Likeness Litig.*,
763 F. Supp. 2d 1379 (J.P.M.L. 2011)....................17

*In re Super Safety Patent Litig.*,
829 F. Supp. 3d 1370 (J.P.M.L. 2026)....................19

*In re The Gap, Inc., COVID-19 Lease Payment Litig.*,
492 F. Supp. 3d 1345 (J.P.M.L. 2020)....................17

*In re Uber Techs., Inc., Passenger Sexual Assault Litig.*,
699 F. Supp. 3d 1396 (J.P.M.L. 2023)....................9, 11, 14

*Van Dusen v. Barrack*,
376 U.S. 612 (1964)....................12

*Vance v. Vance*,
286 Md. 490 (1979) ....................11

*In re Varsity Spirit Athlete Abuse Litig.*,
677 F. Supp. 3d 1376 (J.P.M.L. 2023)....................17

*WhereverTV, Inc. v. Comcast Cable Communications, LLC*,
No. 2:18-cv-529-JLB-NPM ....................18

*Wiwa v. Royal Dutch Petroleum Co.*,
392 F.3d 812 (5th Cir. 2004) ....................9

**Statutes**

28 U.S.C. § 1404....................5

28 U.S.C. § 1407.................... *passim*

Nev. Rev. Stat. § 598.0915 ....................................................................................................11

Nev. Rev. Stat. § 598.0923 ....................................................................................................11

**Rules**

Fed. R. Civ. P. 12....................................................................................................................16

Fed. R. Civ. P. 26......................................................................................................................9

Fed. R. Civ. P. 45......................................................................................................................9

**Nonperiodical Materials**

MANUAL FOR COMPLEX LITIGATION § 20.131 (4th ed. 2004) ......................................................18

## INTRODUCTION

This motion seeks to recreate centralized litigation that the history of these cases has already shown is neither necessary nor efficient. Most of the cases Movants seek to centralize are remnants of a putative class action that was litigated for more than three years in the Northern District of California before class certification was denied. Plaintiffs' highly individualized claims were then severed and transferred to the jurisdictions where their respective alleged injuries occurred for individualized litigation. Other counsel are now using a handful of newly filed cases to attempt to consolidate proceedings, but centralized litigation is emphatically unwarranted.

The cases stand at vastly differing procedural stages with significant common discovery already complete and enormous case-specific (and mostly third-party) discovery remaining. Unlike in the consumer class action context where common questions often drive the outcome of the litigation, these individual product-liability and tort cases are *sui generis*. They turn on case-specific discovery regarding each plaintiff's unique experience, including whether the conduct of third parties was an intervening or superseding cause, whether the safety features of Apple's AirTag worked, and apportionment of fault. Resolving these issues in one case will not resolve them in others. Moreover, the parties can efficiently and informally coordinate the remaining common discovery (*e.g.*, depositions of Apple personnel) without centralization. And the risks of centralizing are severe: It would slow down more advanced claims (which have been litigated for three years) and threaten the settlement dynamic that has recently resolved many of these cases.

Plaintiffs' negligence, product-liability, and unfair-practices claims arise under the laws of at least 13 different states. Plaintiffs allege that third parties tracked their locations by misusing Apple's AirTag (and other non-Apple devices) and concealing AirTag in plaintiffs' possessions. AirTag is an electronic device designed to "help people locate their personal belongings, not to track people or another person's property." Ex. A to David R. Singh Decl. at ¶ 6. Apple has

implemented many industry-leading safety features to impede unauthorized tracking of persons.

Fifteen of the plaintiffs commenced their actions against Apple several years ago as a putative class in the Northern District of California (the "Preexisting Cases"). *See Hughes v. Apple Inc.*, No. 3:22-cv-07668-VC (N.D. Cal.) ("*Hughes* Dkt."). Class certification was denied, and the Preexisting Cases are now proceeding individually. On August 2 and 3, 2026, three plaintiffs represented by different counsel commenced separate actions raising similar claims. On August 4, without consulting Apple or counsel in the Preexisting Cases who have been litigating for years, new counsel filed this motion to centralize pretrial proceedings (the "Motion").

Although these cases have some factual matters in common, most of the common discovery took place in the Preexisting Cases, including production of hundreds of thousands of pages of Apple documents and responses to numerous interrogatories and requests for admission. The vast majority of remaining pretrial work is highly individualized and case-specific. Factually, the parties will litigate: (i) whether AirTag or a third party's misuse of AirTag caused any of plaintiffs' alleged injuries; (ii) whether AirTag and its safety features worked for each plaintiff—for example, whether AirTag triggered notifications to plaintiffs that a third party was tracking them; and (iii) the nature, extent, and apportionment of any alleged damages. Evidence for these issues will consist principally of the documents and testimony of the plaintiffs and third parties affiliated with the respective plaintiffs. And the attendant discovery disputes will concern relevance and proportionality of that discovery. All of these matters are paradigmatically case-specific.

Informal coordination suffices with respect to any remaining common issues and will create efficiencies with respect to the common discovery that has already occurred. Apple is the only defendant in these cases and can easily make that discovery available to plaintiffs, who are also represented by a small number of firms. Indeed, Apple and the plaintiffs' firms involved in these cases have agreed to informally coordinate if centralization is denied. As the only defendant

and the custodian of virtually all common discovery, Apple would support centralizing if it were efficient. It is not. "[C]entralization under Section 1407 should be the last solution after considered review of all other options." *In re Best Buy Co., Inc., Calif. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011). Here, where cases are proceeding efficiently toward resolution in their decentralized form, centralizing is especially unwarranted.

If the Panel grants the Motion, the cases should be centralized in the Middle District of Florida, rather than Movants' choice of the District of Arizona. Three cases are in the Middle District of Florida, with two before Judge John Badalamenti. That court is conveniently located for plaintiffs and near a highly accessible airport, and the District currently has only one MDL.

## BACKGROUND

### A. Apple Introduced AirTag with Industry-First Safety Features

Apple released AirTag in April 2021. AirTag is a device designed to help people locate their personal belongings, not to track people or another person's property. Ex. A at ¶ 6. Consistent with Apple's longstanding approach to device security and user privacy, AirTag launched with multiple features to promote safe and responsible use, and Apple has continued to update its safeguards since launch. These industry-first safety features were specifically designed to mitigate the potential for misuse by bad actors. For example, Apple developed a safety feature whereby iPhone and iPad users receive unwanted tracking alerts on their devices notifying them if an unknown AirTag is moving with them. *See* Apple Inc., *Apple Personal Safety User Guide*, https://support.apple.com/guide/personal-safety/detect-unwanted-trackers-ips139b15fd9/web (last visited Aug. 25, 2026). AirTag emits a sound when it moves separately from its owner. *Id.* If a person finds an AirTag, AirTag offers instructions on how to disable it. *Id.* And AirTag will notify the person with whom it is moving of a portion of its owner's contact information. *Id.*

Since AirTag's launch, Apple has continued to design and implement innovative safety

features. Apple partnered with Google to enable Android users to automatically receive unwanted tracking alerts as well. *See id.* Apple and Android users, using the Tracker Detect app, can search their vicinity for AirTags traveling apart from their owners. Apple has also adjusted the alerts to be more audible, and users can retrieve unwanted tracking notifications after dismissing them.

**B. Plaintiffs Allege Widely Varied Experiences with AirTag and Third Parties**

Plaintiffs allege that third parties unrelated to Apple used AirTags (and other non-Apple devices) to track their locations without their consent—by, for example, concealing AirTags in their cars or purses. Plaintiffs further allege that Apple's design and marketing of AirTag placed them at unreasonable risk of having their locations tracked without their consent, and that they therefore have causes of action for negligence, products liability, and unfair practices under various states' consumer-protection statutes. Plaintiffs seek damages for alleged monetary and emotional costs, and varying injunctions against the conduct each plaintiff claims is unlawful.

The facts underlying plaintiffs' allegations vary widely. Some plaintiffs allege a former romantic partner tracked their location. In other cases, it appears that the third party was tracking someone else in the plaintiff's presence—typically a parent who had placed an AirTag in a minor child's belongings—and incidentally learned of the plaintiff's location. Other plaintiffs never identified the person who tracked them, and still others never found an AirTag. Plaintiffs also allege different (and conflicting) defects with AirTag. For example, some complain that AirTag alerts should have come sooner or more frequently, but others assert the frequent alerts caused anxiety. Many plaintiffs found the AirTag quickly, sometimes with the help of others.

**C. Most Plaintiffs' Claims Have Been Litigated for More than Three Years**

These cases began in December 2022 as a putative class before Judge Vince Chhabria of the U.S. District Court for the Northern District of California. The initial two named plaintiffs alleged negligence, design defect, and unfair practices under California's Unfair Competition Law.

In October 2023, plaintiffs filed an amended complaint that added 38 named plaintiffs. Apple filed two motions to dismiss, each of which was granted in part and denied in part. Meanwhile, discovery progressed significantly, albeit focused on class certification issues. Apple deposed all then-39 named plaintiffs, responded to 20 interrogatories and 41 requests for admission, served interrogatories on each plaintiff, and produced over 285,000 pages of documents. Plaintiffs responded to similar written discovery and produced over 21,000 pages of documents.

Discovery revealed that third parties will be key witnesses for both liability and damages. The persons who allegedly tracked plaintiffs will testify regarding causation and the share of liability, if any, that should be apportioned to them. *See Hughes v. Apple Inc.*, 2024 WL 4828072, at *5 (N.D. Cal. Nov. 18, 2024) (expressing "little doubt" that "the stalkers' . . . conduct contributed to the plaintiffs' injuries"). The testimony of friends or relatives who helped locate AirTags may be dispositive, as Judge Chhabria recognized when he dismissed a plaintiff's claim that showed "the safety features worked for her to quickly locate and disable the AirTag." *Id.* Some plaintiffs reported the AirTag to local police, who can offer important testimony on third-party wrongdoing. And plaintiffs' family, medical providers, and employers will offer crucial evidence related to emotional distress, lost income, and any other claimed damages.

Judge Chhabria denied class certification in March 2026. *See Hughes* Dkt. Nos. 287, 291. The parties stipulated to sever the cases after the court stated that the plaintiffs had clearly been misjoined. *Hughes* Dkt. No. 291 at 17:11–12, *id.* No. 305. Thirty plaintiffs then proceeded on individual complaints in the Northern District of California. Each complaint raised both the set of California-law claims included in the class complaint and similar claims under each respective plaintiff's home-state law. Apple moved under 28 U.S.C. § 1404(a) to transfer each case to the jurisdiction where the alleged tracking of the plaintiff took place. Plaintiffs opposed only two of Apple's transfer motions, but the court granted all of them, accepting Apple's argument that key

issues including causation and apportionment would turn on home-state witnesses. Since then, 15 federal plaintiffs have settled, and the remaining 15 cases continue to proceed in federal court. Six California-resident plaintiffs from the putative class commenced litigation in state court. Four have since settled, and one new California plaintiff has commenced a state court action.

Apart from the plaintiffs in the Preexisting Cases, three plaintiffs filed new federal actions against Apple on August 2 and 3, 2026. Those complaints raised similar claims under the law of their home states. On August 4, counsel for the new plaintiffs filed the instant motion to centralize and consolidate pretrial proceedings before Judge Diane Humetewa in the District of Arizona. As explained below, the Motion contains various misrepresentations, including about Judge Humetewa's involvement with these matters. As she recently clarified—in denying one new plaintiff's attempt to have a case reassigned to her—she "has no familiarity [with] the claims" in this litigation despite Movants' assertion to the contrary. *See* Ex. B at 2 (Humetewa Order). Eight other cases have been commenced in federal court since the Motion was filed, and counsel in one such case—brought in the Eastern District of Michigan—has filed a brief in support of the Motion. Counsel in the newly filed cases have represented to Apple that they are coordinating with each other and have extensive working relationships. There are thus effectively two groups of plaintiffs' counsel: the new counsel and the one firm representing plaintiffs in the Preexisting Cases.

## <u>ARGUMENT</u>

The Panel may centralize cases for coordinated pretrial proceedings when they "involv[e] one or more common questions of fact," and transfer will further "the convenience of parties and witnesses" and "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a). The moving party bears the burden of persuasion, as centralization "should be the last solution after considered review of all other options." *Best Buy Co.*, 804 F. Supp. 2d at 1378. In assessing whether centralizing would be efficient, the Panel considers factors such as the nature and

significance of the common factual questions, individualized discovery and case-specific issues, the risk of duplicative work or inconsistent rulings, and less burdensome alternatives. *See, e.g.*, *In re Range View Mgmt., LLC TCPA Litig.*, 753 F. Supp. 3d 1375, 1376–77 (J.P.M.L. 2024).

These factors do not support centralization. Each case turns on three components: the legal framework, facts related to AirTag's design, and facts related to the misuse of AirTag. At most, only the questions about the AirTag's design and marketing are common across the cases—and even then, plaintiffs allege different design defects that call for different fact and expert discovery. The parties have undertaken a great deal of the common discovery, and most of the remaining discovery will be case-specific. Informal coordination of remaining common discovery—such as document repositories controlled by each main plaintiffs' firm and cross-noticed depositions of Apple witnesses—is superior to centralized proceedings. That conclusion is reinforced since the parties' working relationships have facilitated the settlement of 20 actions in the last two months.

Without first determining the practicability of alternatives to Section 1407 centralization, Movants here sought centralization *immediately* after filing their complaints. They did not attempt to: (1) coordinate with Apple or counsel in the Preexisting Cases; or (2) understand the procedural history of the far more advanced cases. Centralizing now jeopardizes the parties' recent progress to global resolution and risks slowing down the more advanced Preexisting Cases.

## I. The Panel Should Decline to Centralize These Actions.

### A. Most of the Remaining Issues Are Case-Specific.

The remaining factual and legal issues distinctive to each case overwhelm anything in common and prevent Movants from showing that centralized proceedings "will promote the just and efficient conduct of [the] actions." 28 U.S.C. § 1407(a).

#### 1. The Remaining Fact Discovery Is Largely Case-Specific.

Significant discovery has already occurred in the Preexisting Cases. Plaintiffs and Apple

have each answered interrogatories and requests for admission, and Apple has produced over 285,000 pages of documents and conducted 39 depositions of plaintiffs, and Preexisting Plaintiffs and Apple have responded to hundreds of interrogatories. Plaintiffs may "dispute the adequacy of [Apple's] production," but "there is no doubt that the discovery that has occurred to date has been substantial." *In re Cymbalta Prods. Liab. Litig.*, 65 F. Supp. 3d 1393, 1394 (J.P.M.L. 2014). In fact, the court in one of the Preexisting Cases has set a trial date for May 11, 2027. *See* Ex. C.

Remaining discovery, on the other hand, is largely case-specific, especially with respect to the third parties affiliated with plaintiffs. The factual issues in these cases generally include: (i) whether a third party used an AirTag or another non-Apple device to allegedly track plaintiffs; (ii) whether AirTag or a third party's misuse of AirTag *caused* plaintiffs' alleged injuries; (iii) whether AirTag and its various safety features worked; and (iv) the nature, extent, and apportionment of any alleged damages. Apple's anticipated defenses differ significantly case by case. For example, in some cases, it appears that the alleged wrongdoer was not tracking the location of the plaintiff, but of their own minor child over whom they share custody with the plaintiff. *See, e.g.*, *Doe v. Apple Inc.*, No. 2:26-cv-04252-SJB-JMW (E.D.N.Y.). Other cases raise causation issues because the third-party wrongdoer had previously tracked the plaintiff's location without using AirTag. *See, e.g.*, *Doe v. Apple Inc.*, No. 2:26-cv-2178-ART-EJY (D. Nev.). And in all cases, defenses will turn on whether the conduct of the third-party wrongdoer—sometimes known to the plaintiff, sometimes not—broke the chain of causation between AirTag and the harms plaintiffs allege. According to Judge Chhabria, "proximate cause[] . . . is relevant for all the negligence and product liability claims," and it is "a significant and heavily fact-bound inquiry." *Hughes*, 2024 WL 4828072, at *4–5. Apple will also make case-specific arguments that AirTag's safety features worked to allow plaintiffs "to quickly locate and disable the AirTag." *Id.* at *5. And damages will be disputed in every case. Preexisting Plaintiffs' unsupported assertion that

"Apple will necessarily defend[] each action through substantially identical factual and legal arguments" is baseless. Br. at 3.

The parties will rely on different witnesses to introduce this evidence in each case. In most cases, the person who allegedly tracked the plaintiff will be a key witness. Other crucial witnesses include law enforcement personnel; those who retrieved AirTags and can testify to the efficacy of their safety features and the ease of locating and disabling the devices; romantic partners who observed some or all relevant events; healthcare providers, friends, or family who can address emotional damages related or unrelated to AirTag; employers who can address lost wages; and any other witness who can address the diverse damages claims including, in various cases, medical expenses, moving costs, security-system costs, and even loss of alimony payments.

The obvious disputes over this evidence will concern relevance and proportionality. Proportionality turns on "the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1); *see also* Fed. R. Civ. P. 45(d)(1). These are necessarily case-specific—and witness-specific—inquiries. *See, e.g.*, *Avila v. Ford Motor Co.*, 680 F. Supp. 3d 1125, 1129 (N.D. Cal. 2023) ("The relevance and proportionality requirements of Rule 26 are necessarily very fact specific."); *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812, 818 (5th Cir. 2004) (similar under Rule 45(d)(1)). Similarly, there is little prospect of genuinely conflicting rulings because each will turn on specific facts and the particular elements of each state-law claim.

These characteristics distinguish the *Uber* case Movants cite. *See In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 699 F. Supp. 3d 1396 (J.P.M.L. 2023). There, common fact issues included Uber's knowledge of alleged assaults by drivers, background-check practices, driver training, safety measures, responses to complaints, and overall control of the drivers. *See id.* at

1398. The claims here arise from alleged misuse of AirTags by independent third parties with whom Apple has no agency or other relevant relationship and no ability to control. And the *Uber* plaintiffs were all Uber customers who used its platform in the same basic manner. Plaintiffs here are not Apple consumers in a relevant way. They did not purchase the AirTags at issue, which they encountered in disparate circumstances that turned entirely on the behavior of independent third-party actors. *See In re The Church of Jesus Christ of Latter-day Saints Sexual Abuse Litig.*, 776 F. Supp. 3d 1356, 1357–58 (J.P.M.L. 2025) (denying centralization and distinguishing *Uber* because the relationships and interactions at issue were insufficiently uniform).

Movants confusingly contend that these individualized issues are "the very characteristics that make these actions suitable for mass tort treatment rather than class adjudication." Motion at 6. It is true that, unlike most class actions, centralization under Section 1407 does not require predominance of common issues. But suggesting that the predominance of *individual* matters affirmatively *supports* centralization simply confuses the issues. The question is whether centralization would promote efficiency and convenience, and the answer is that it would not because the issues and discovery will be primarily case specific.

**2. Nearly Every Case Will Entail Application of a Different Legal Framework.**

Plaintiffs bring causes of action under the laws of at least 13 states. These laws vary significantly, which will impede centralized resolution of dispositive motions and complicate inquiries into what discovery and evidence will be relevant under which states' laws. The Panel has frequently explained that the application of many different state laws weighs against centralization. *See, e.g.*, *In re Cincinnati Ins. Co. COVID-19 Bus. Interruption Protection Ins. Litig.*, 492 F. Supp. 3d 1347, 1349–50 (J.P.M.L. 2020); *In re Hartford COVID-19 Bus. Interruption Protection Ins. Litig.*, 493 F. Supp. 3d 1358, 1360–61 (J.P.M.L. 2020). While it is not uncommon for a "transferee judge to . . . apply the law of more than one state," those cases

typically involve at least *some* federal or otherwise common claims. *In re CVS Caremark Corp. Wage & Hour Employment Practices Litig.*, 684 F. Supp. 2d 1377, 1378 (J.P.M.L. 2010) (central claim brought under the Fair Labor Standards Act). Here, the numerous and widely varying legal frameworks weigh strongly against centralizing.

Product-liability law has state-by-state variations in fundamental issues. Some states use the risk-benefit test for assessing defective products, whereas others use the distinct consumer-expectations test. *Compare, e.g.*, *Jones v. NordicTrack, Inc.*, 550 S.E.2d 101, 103 (Ga. 2001) (risk-benefit), *with Ford Motor Co. v. Trejo*, 133 Nev. 520, 521 (2017) (consumer expectations). Only the risk-benefit test typically requires proof that "it was feasible to design the product in a safer manner." *Adamo v. Brown & Williamson Tobacco Corp.*, 900 N.E.2d 966, 968 (N.Y. 2008).

Consumer-protection law also varies with respect to, for example, whether only a purchaser of a product (which no plaintiff is) has standing. *See, e.g.*, *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1221 (S.D. Fla. 2017); *Naples v. Stefanelli*, 972 F. Supp. 2d 373, 399 (E.D.N.Y. 2013). Other states require scienter. *See, e.g.*, Nev. Rev. Stat. §§ 598.0915(2), 598.0923(2).

Negligence law is notoriously variable, even in basic concepts "such as duty of care, foreseeability, and proximate cause." *In re Rhone-Poulenc Rorer Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). Most relevant here, the recoverability of emotional distress damages absent physical injury ranges widely. *See, e.g.*, *SCI Texas Funeral Services, Inc. v. Nelson*, 540 S.W.3d 539, 543–44 (Tex. 2018) (emotional damages available absent physical injury in narrowly defined special circumstances); *Vance v. Vance*, 286 Md. 490, 500–04 (1979) (emotional distress recoverable when capable of objective determination and proximately caused by the defendant); *Lee v. State Farm Mut. Ins. Co.*, 272 Ga. 583, 584–86 (2000) (recovery generally requires physical impact and injury). And while the Panel centralized *Uber* despite variations in negligence law, it explained that "pretrial proceedings . . . will be focused on far more than this one issue." 699 F. Supp. 3d at

1399. Here, *all* causes of action are highly variable and dependent on particular state law.

New plaintiffs who recently filed complaints in Michigan assert that the state laws at issue are "strikingly similar," but their analysis misses the mark. Dkt. No. 7-1 at 3. They cite state law on failure to warn—a peripheral matter that very few plaintiffs allege—and they do not engage with the vast differences catalogued above. The Motion does not address this issue at all, and the Preexisting Plaintiffs elide it as well. They claim Apple will "advance many of the same threshold legal defenses," Br. at 13, and then name a half-dozen categories at such extreme generality that they would describe any party's defenses to a tort action—"duty," "foreseeability," "proximate cause." They say nothing about the notable state-by-state variations in those concepts.

In addition to the significant variance among the many states' laws under which plaintiffs bring their claims, the Preexisting Cases also introduce varied choice-of-law issues because plaintiffs make claims under the law of California and their respective home states. California's choice-of-law framework evaluates the public policy of the other state whose law may apply. *See Nedlloyd Lines B.V. v. Superior Court*, 3 Cal. 4th 459 (1992); *McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 81–82 (2010).[1] As noted above, public policy varies widely, so these issues require a "thorough legal analysis" and present a "treacherous (not to mention expensive) road" down which a judge must travel. *Hughes*, 2024 WL 4828072, at *1 n.1. Other case-specific matters pervade the choice-of-law issue as well. To take just one example, Plaintiff Frank Freeman argues that the California choice-of-law provision in the terms of service for Apple's Tracker Detect app governs, but Mr. Freeman did not download Tracker Detect or agree to its terms until after the AirTag at issue had already been found. *See Hughes* Dkt. No. 232 at 17.

[1] Because the Preexisting Cases were initially filed in federal court in California, California choice-of-law principles will govern even after transfer to other federal district courts. *See Ferens v. John Deere Co.*, 494 U.S. 516 (1990); *Van Dusen v. Barrack*, 376 U.S. 612 (1964).

### B. To the Extent Common Discovery Remains, Informal Coordination Can Achieve the Benefits of Centralization Without the Accompanying Costs.

The Panel has held that "centralization under Section 1407 should be the last solution after considered review of all other options." *Best Buy Co., Inc.*, 804 F. Supp. 2d at 1378. That is for good reason: Informal coordination avoids the need for remand to transferor judges for trial, and centralization can hinder progress by requiring a single judge to resolve numerous complex cases. *See Lexecon Inc. v. Milberg Weiss*, 523 U.S. 26, 40–41 (1998); *Cincinnati Ins. Co. COVID-19 Bus. Interruption Prot. Ins. Litig.*, 492 F. Supp. 3d at 1349–50. Informal coordination is preferable, and would be particularly effective and efficient here.

When Movants brought this Motion—without conferring with any other party or understanding the yearslong history of this matter—Apple and counsel in the Preexisting Cases had begun successfully coordinating schedules and discovery for the Preexisting Cases. *See, e.g.*, Exs. D, E. That coordination has been stymied temporarily by the Motion, but the parties intend to resume coordinating if the Panel denies centralization. Movants have since also agreed to coordinate any common issues if centralization is denied and have already worked with Apple to arrange a schedule for pleading motions if centralization is denied. *See, e.g.*, Ex. F. Those efforts should be permitted to run their course.

***First***, numerous concrete coordination mechanisms have been and will continue to be put to use. Preexisting Plaintiffs assert that courts and parties must "reconstruct the same pretrial record" in every case—this assertion is both incorrect and inconsistent with the parties' coordination thus far. Br. at 17. The parties can agree, for example, that a document Apple produces in one case will be considered to have been produced in all cases. Apple is also amenable to permitting the two main plaintiffs' counsel to maintain repositories of all documents produced in their cases that can be used in any of their other cases, subject to appropriate confidentiality. Similarly, discovery responses and privilege logs can be used across the cases. The parties can

cross-notice depositions so that Apple-affiliated witnesses are deposed only once, as Movants have expressed willingness to arrange. To the extent expert discovery concerns common issues (even though plaintiffs do not allege the same defects with AirTag, and law on the necessity of an alternative safer design varies), Apple will cooperate with plaintiffs to produce coordinated reports and allow for efficient expert depositions, including by permitting plaintiffs' counsel to share time deposing any Apple expert(s) who address common issues.

***Second***, informal coordination will be especially efficient in light of the relatively few counsel involved. The same two national law firms are co-counsel for Apple—the only defendant—in every case. At this time, it appears there are only two groups of plaintiffs' lawyers who control nearly all of the cases. The Wade Kilpela Slade firm represents all the plaintiffs in the Preexisting Cases. Bailey & Glasser LLP and/or Floyd Law, which have long worked closely with each other, represent Movants and four other plaintiffs who have brought claims since the Motion was filed. Those two firms further indicated to Apple that they have a long working relationship with counsel who have brought other cases. The Panel should therefore follow *In re Harvest Entities Fair Labor Standards Act (FLSA) & Wage & Hour Litigation*, where the actions at issue "undoubtedly" shared factual questions, but informal coordination was a "practicable and preferable alternative" because of the small number of counsel involved and the parties' willingness to avoid duplicative discovery. 584 F. Supp. 3d 1380, 1381–82 (J.P.M.L. 2022); *see also Cymbalta*, 65 F. Supp. 3d at 1394 (denying centralization where "just two firms represent plaintiffs in all the constituent actions, and [the defendant] is represented in all actions by a single law firm").[2] Preexisting Plaintiffs speculate that many more cases will be filed because Apple has received 40,000 reports related to AirTag. This overinclusive figure confirms the opposite—

[2] These differences further distinguish *Uber*, where there were 79 actions pending in 13 districts, and at least 14 different plaintiffs' firms were involved. 699 F. Supp. 3d at 1399.

despite aggregating all reports related to AirTags since its 2021 launch, there have been only a few dozen complaints filed—with the statute of limitations looming, if not already expired. Further, "the mere possibility of additional actions does not support centralization, even where thousands of actions are predicted." *In re Hotel Indus. Sex Trafficking Litig.*, 433 F. Supp. 3d 1353, 1356 (J.P.M.L. 2020). And despite the Panel's interest in "steps the[] [parties] have taken to pursue alternatives to centralization," such as "informal coordination of discovery and scheduling," Dkt. No. 24 at 2, Preexisting Plaintiffs say not one word about this topic—perhaps because they would be forced to acknowledge the significant steps already taken.

***Third***, informal coordination will already be necessary because the Wade Kilpela Slade firm represents three plaintiffs with actions against Apple in California state court—beyond the reach of any MDL court. Where some cases will remain beyond the reach of a transferee court, centralizing the federal cases adds procedural machinery without facilitating the coordination the parties will have to manage anyway. *Cf. In re California Wine Inorganic Arsenic Levels Products Liability Litigation*, 109 F. Supp. 3d 1362, 1363–64 (J.P.M.L. 2015) (denying centralization where parties represented they would coordinate between the federal and state actions).

*In re Cymbalta Products Liability Litigation* is especially persuasive. There, the Panel warned of the pitfalls of centralization when the parties have undertaken substantial common discovery, have a great deal of remaining case-specific discovery, and show the possibility of coordinating any remaining common discovery. 65 F. Supp. 3d 1393. The Panel acknowledged that the more-than-40 pending cases about a drug Eli Lilly had manufactured were "highly similar" and "share[d] factual issues concerning" the drug's "development, marketing, labeling, and sale." *Id.* at 1393. But that was insufficient. *Cymbalta* explained that: (i) significant common discovery had already taken place; (ii) what remained was fact-specific; (iii) the limited number of counsel on all sides allowed for informal coordination; and (iv) varying procedural postures of the

underlying cases also supported denial. *Id.* at 1393–94.

Similarly, in this case, substantial common discovery has already occurred, the remaining discovery is largely case-specific, the limited number of counsel on each side can informally coordinate remaining common discovery, and the varying procedural postures would make consolidation difficult. While Apple has not yet made available corporate representatives, it can do so for cross-noticed depositions. Preexisting Plaintiffs have no answer for *Cymbalta*. They recite categories of purportedly common issues, but do not acknowledge the substantial discovery that has taken place or identify a specific remaining matter that requires centralized supervision. The appropriateness of such informal coordination is only reinforced here, where Movants brought this Motion immediately after filing their complaints—despite that centralization "should be the last solution after considered review of all other options." *Best Buy Co., Inc.*, 804 F. Supp. 2d at 1378. If centralizing would reduce burdens, Apple—the custodian of the common discovery—would know and request it. But it will not.

### C. Centralization Would Risk the Progress Already Made Toward Resolution and Create Inefficiencies Stemming from Differing Procedural Postures.

Centralization is not only unnecessary; it would introduce affirmative inefficiencies.

***First***, the mismatched procedural progression of the cases means that centralization would inevitably slow progress in the Preexisting Cases. While many Preexisting Cases have pleading deficiencies and will be subject to motions under Federal Rule of Civil Procedure 12, their factual records are substantially more developed. It will be time-consuming for the new plaintiffs and their counsel to familiarize themselves with this record and progress their own cases similarly. The Panel has found that mere months-long differences in the pendency of cases support denying centralization in light of "varying procedural postures" in the cases. *Cymbalta*, 65 F. Supp. 3d at 1393–94; *In re Lloyds Bank plc Int'l Mortg. Serv. Loan Litig.*, 997 F. Supp. 2d 1352, 1353 (J.P.M.L. 2014) (denying centralization, in part because of the "widely varying procedural

postures" of the subject actions). Here, the yearslong record in the Preexisting Cases includes hundreds of thousands of pages of documents and depositions that revealed critical information about plaintiffs' claims, whereas the new cases are in their infancy. In a scheduling order that is likely illustrative of how other courts may proceed, one court has set a Preexisting Case for trial on May 11, 2027. *See* Ex. C. Centralizing all these cases on the same track will slow down the Preexisting Cases and delay resolution of the oldest claims.

***Second***, the parties have efficiently worked to resolve many cases, settling 20 actions in the last two months (including one claim that settled prior to litigation). Settled cases comprise about half of those that have been brought, including nine on Movants' schedule of cases that they strangely imply should be centralized anyway. *See* Ex. G. While this action was pending as a class case for 3.5 years, no plaintiff settled. The settlements took place after it became clear that most or all of the Preexisting Cases would be transferred (ultimately, all were) and decentralized. Apple continues to negotiate in good faith with plaintiffs in the Preexisting Cases.

The Panel has declined to centralize cases when the parties have a track record of consensually resolving them. *See, e.g.*, *In re Brandywine Commc'ns Techs., LLC, Patent Litig.*, 959 F. Supp. 2d 1377, 1378 (J.P.M.L. 2013) (denying centralization where "more than half" of the cases had already been settled); *In re The Gap, Inc., COVID-19 Lease Payment Litig.*, 492 F. Supp. 3d 1345, 1346 (J.P.M.L. 2020). This "recent procedural history" of effective decentralized litigation shows "that centralization might hinder the orderly and efficient resolution of these cases." *The Gap*, 492 F. Supp. 3d at 1346 (citation and quotation marks omitted).

The Panel has "found persuasive" that the party "who would be most affected by centralization . . . do[es] not believe that centralization would be beneficial." *In re Varsity Spirit Athlete Abuse Litig.*, 677 F. Supp. 3d 1376, 1378 (J.P.M.L. 2023) (quoting *In re Student Athlete Name & Likeness Litig.*, 763 F. Supp. 2d 1379, 1380 (J.P.M.L. 2011)). That is clearly Apple: the

only defendant and the party with control over all the common discovery. If centralization were efficient, Apple would be first in line to request it. But because continued informal coordination offers the far better path, Apple respectfully opposes Movants' day-one request to centralize.

## II. If the Panel Orders Centralization, It Should Centralize the Cases in the Middle District of Florida.

Apple maintains that the Panel should not centralize these cases, but if the Panel takes a different view, the Panel should centralize the cases in the Middle District of Florida.

The Panel selects a transferee jurisdiction based on factors such as: the locus of the most procedurally advanced cases; the forum that will minimize cost and inconvenience to the parties and witnesses; and the experience, ability, and caseload of the judges. MANUAL FOR COMPLEX LITIGATION § 20.131, at 221 (4th ed. 2004); *In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Products Liability Litig.*, 249 F. Supp. 3d 1348, 1351 (J.P.M.L. 2017).

The Middle District of Florida stands out on these factors. It has three cases, two of which are among the Preexisting Cases and are more advanced. Both of these cases are assigned to the Honorable John Badalamenti, who (unlike any judge in the Northern District of California) could thus preside over one or more trials. *See In re Gerber Probiotic Products Marketing & Sales Practices Litigation*, 899 F. Supp. 2d 1378, 1380 & n.4 (J.P.M.L. 2012) ("[E]fficiency . . . may be enhanced by increasing the number of cases" that the transferee court could try.). The District is also conveniently located. Plaintiffs reside predominantly in the Eastern half of the United States: Only four of the 26 cases are in courts west of Texas, and at least five are in Florida and Georgia alone. Judge Badalamenti sits in downtown Tampa, six miles from Tampa International Airport.

The Middle District of Florida also has only one active MDL, *see* Ex. H, and Judge Badalamenti has never presided over an MDL, but he has handled numerous complex civil matters. *See, e.g.*, *WhereverTV, Inc. v. Comcast Cable Communications, LLC*, No. 2:18-cv-529-JLB-NPM (technically complex patent case entailing *Daubert* challenges and a summary judgment motion);

*Scoma Chiropractic, P.A. v. Dental Equities, LLC*, No. 2:16-cv-41-JLB-MRM (class action). The Panel often assigns MDLs to judges who have "not yet had the opportunity to preside over" one. *In re Super Safety Patent Litig.*, 829 F. Supp. 3d 1370, 1374 (J.P.M.L. 2026); *In re BPS Direct, LLC, and Cabela's, LLC, Wiretapping Litig.*, 677 F. Supp. 3d 1363, 1365 (J.P.M.L. 2023).

Movants' request to centralize the cases in the District of Arizona before the Honorable Diane J. Humetewa should be rejected. Apple does not doubt Judge Humetewa's capabilities, but she has virtually no connection to the cases, notwithstanding Movants' deceptive arguments to the contrary. A Preexisting Case was transferred to Judge Humetewa in July 2026, but it settled immediately. *See Doe v. Apple Inc.*, No. 2:26-cv-05261-PHX-DJH, Dkt. Nos. 26–27. Based on that case, Movants assert Judge Humetewa "has familiarity with the common factual issues at stake" in the AirTag-related litigations against Apple. Motion at 2. Judge Humetewa explained that she "has no familiarity [with] the claims [in the AirTag litigation] . . . in light of" the "settlement" of the one case before her. *See* Ex. B at 2. Movants cite a second case pending in the District of Arizona, where one of Movants' counsel represents the plaintiff. The Motion indicates that case had also been assigned to Judge Humetewa, Motion at 7 (asserting Judge Humetewa had "presid[ed] over the related actions"), but also that "a civil action number and judge ha[d] not yet been assigned to" it. *Id.* at 2 n.2. Both assertions are false: The case had been assigned to Judge James Teilborg the day before the Motion was filed. *See Doe S.B. 1 v. Apple Inc.*, No. 2:26-cv-05421-PHX-SPL, Dkt. No. 2. Indeed, the plaintiff *moved* on August 5 to have the case assigned to Judge Humetewa, seemingly to bolster this Motion, but Judge Humetewa denied the request.[3]

[3] The Motion includes other concerning signs. It appears to reflect a comment that should have been deleted prior to filing or, potentially, the output of an artificial intelligence application. *See* Motion at 6 ("Judge Chhabria is understood to have suggested at a hearing that the claims should have been pursued as a mass tort, comparing them to the Uber-driver-assault MDL, though that statement should be verified against the hearing transcript before filing."). Similar errors have turned up in complaints. *See* Compl. ¶ 135, *Doe M.S. 1 v. Apple Inc.*, 3:26-cv-00262-PDW-ARS (D.N.D. Aug. 17, 2026), Dkt. No. 1 ("*See [CITE: Insert verified North Dakota negligence case*

Counsel in the Preexisting Cases seek centralization in the Northern District of California. Although Judge Chhabria ably presided over the Preexisting Cases, Preexisting Plaintiffs mischaracterize Judge Chhabria's comments during the class certification hearing, and convenience and efficiency would not be served by centralizing in that court. First, Judge Chhabria's statement that a "mini MDL within the district . . . seems like a far superior mechanism"—and any offer to "volunteer" to handle such an action—was expressly conditioned on the severed complaints' remaining "in the Northern District of California"—which they did not. Br. at 16, 19. Second, most of the discovery that Judge Chhabria oversaw occurred in the class-certification context, and his rulings on dispositive motions addressed only California law.[4] This experience creates no advantage for presiding over an MDL with primarily non-California claims and where discovery will focus heavily on plaintiffs and third-party witnesses. Moreover, because no cases remain in the Northern District of California, Judge Chhabria could not preside over a trial. California is also far less convenient geographically for the plaintiffs than Florida in light of the cases' eastern skew. And while Apple is located in California, it anticipates no difficulty producing documents and testimony in Florida. Finally, the Northern District of California has a congested MDL docket with 19 pending proceedings, three of which are before Judge Chhabria. If the Panel centralizes, the Middle District of Florida is the clear choice.

## CONCLUSION

The motion to centralize under 28 U.S.C. § 1407(a) should be denied. If the Panel grants the Motion, it should centralize the actions in the Middle District of Florida.

---

*establishing duty/elements of negligence.]*").

[4] Preexisting Plaintiffs contend that Magistrate Judge Hixson's "experience with this litigation would be lost" if the cases were centralized elsewhere. Br. at 16 n.7. His management of discovery disputes related to the now-abandoned class posture, and nothing would be "lost" because the Protective Order and all other discovery to date can be informally coordinated across all actions.

Dated: August 25, 2026

Respectfully submitted,

By: */s/ David R. Singh*

DAVID R. SINGH (CA Bar No. 300840)
MORGAN D. MACBRIDE (CA Bar No. 301248)
WEIL, GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000
Facsimile: (650) 802-3100
Email: David.Singh@weil.com

ARTURO J. GONZALEZ (CA Bar No. 121490)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

ALEXANDRA P. BARLOW (CA Bar No. 299715)
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 200
San Diego, CA 92130-3588
Telephone: (858) 720-5100
Facsimile: (858) 720-5125

*Attorneys for Defendant*
*Apple Inc.*