**BEFORE THE**
**UNITED STATES JUDICIAL PANEL ON**
**MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE: APPLE AIRTAG MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION** | **MDL NO. 3199** |

# AMENDED RESPONSE OF INTERESTED PARTY PLAINTIFFS BRITTANY ALOWONLE *ET AL.* TO MOTION TO TRANSFER AND CENTRALIZE RELATED CASES PURSUANT TO 28 U.S.C. § 1407

Pursuant to 28 U.S.C. § 1407 and Rules 6.1 and 6.2 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, Responding Plaintiffs[1] submit their response to the motion for centralization and transfer filed on August 4, 2026. ECF No. 1. For the reasons set forth below, Responding Plaintiffs agree that the Related Actions[2] should be coordinated for consolidated pretrial proceedings.

Responding Plaintiffs, however, respectfully submit that these cases should be consolidated and transferred where the case has been pending for nearly four years, to the United States District Court for the Northern District of California before the Honorable Vince Chhabria, who said he would "certainly volunteer" to be the transferee judge. The present litigation arises directly from the severance of approximately 40 plaintiffs' claims previously litigated together in

[1] Responding Plaintiffs are Brittany Alowonle, Paola Ballester, Joel Beidleman, Lyris Brady, Gail Burke, Lisa Castle, Jane Doe 1, Jane Doe 2, Jane Doe 3, Jane Doe 4, Rachel Fox, Desiree and Frank Freeman, Tonya Harris, Vincent Hopkins, Lauren Hughes, Sofia Hussein, Jessica Johnson, Cody Lovins, Dorothy Miller, Kristen Morris, Aine O'Neill, Karry Schuele, Jacqueline Ward, and Chelsea Williams. Responding Plaintiffs' Amended Schedule of Related Actions is attached hereto as Exhibit A.

[2] As used in this Response, Related Actions collectively refers to the actions identified in Movant's Schedule of Actions (ECF No. 1-2), Interested Parties Jane Doe 1 and 2's Schedule of Actions (ECF No. 7-2), and all Notices of Related Actions filed to date (ECF Nos. 14, 17-18).

*Hughes v. Apple, Inc.*, No. 3:22-cv-07668-VC (N.D. Cal.), which was presided over by Judge Chhabria for over three years. Judge Chhabria is therefore uniquely positioned to preside over these cases due to his substantial familiarity with the factual allegations, legal issues, and procedural history underlying this litigation.

## I. INTRODUCTION

This litigation presents precisely the type of circumstance for which Congress enacted 28 U.S.C. § 1407: "to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation costs, and save the time and effort of the parties, the attorneys, the witnesses, and the courts." *Silverthorn v. Lumber Liquidators, Inc.*, 2015 U.S. Dist. LEXIS 64807, at *18 (N.D. Cal. May 15, 2015) (citing Manual for Complex Litigation, Fourth, at 220 (2004)) (internal quotations omitted).

Thirty-two actions are presently pending in twenty-three federal districts throughout the country.[3] Each action asserts substantially identical claims, arising from Apple's design, development, marketing, and distribution of Apple AirTags as well as its policies concerning unwanted tracking. Each alleges Apple knowingly released a consumer tracking device that, while intended to help users locate personal property, was foreseeably and repeatedly weaponized by stalkers, domestic abusers, and other bad actors to monitor victims' real-time locations without their knowledge or consent. Because by April 2024 Apple had already received approximately 40,000 complaints or reports concerning unwanted tracking, the undersigned counsel expect that the dozens of cases filed in the past few months represent a tiny fraction of the number of individual actions that will be filed against Apple due to incidents of AirTag stalking.

Although the individual plaintiffs experienced different incidents of stalking, the actions

---

[3] Those numbers are sure to continue to rise. In addition to the currently pending cases, the undersigned will be filing several additional actions in the near future on behalf of individuals that have been retained in the last several weeks.

share the same core factual and legal questions. Each case will require discovery into the same corporate decision making, the same engineering choices, the same product development history, the same internal testing, the same knowledge of foreseeable criminal misuse, the same safety features, the same software updates, the same marketing representations, the same policies concerning unwanted tracking complaints or inquiries, and the same corporate documents and witnesses. The Plaintiffs will prosecute, and Apple will necessarily defend, each action through substantially identical factual and legal arguments concerning Apple's negligent conduct and defective design.

Absent centralization, courts across the country will be required to oversee duplicative discovery involving the same documents and custodians, resolve overlapping privilege and discovery disputes, supervise repeated depositions of the same Apple employees, address identical expert testimony, and decide substantially similar dispositive and evidentiary motions. Such substantial duplication almost ensures inconsistent rulings, while imposing unnecessary burdens on the judiciary, the parties, and third-party witnesses. Yet Apple fully intends to take advantage of the lack of nationwide coordination to seek different results in different cases and to limit the discovery available to each plaintiff. *See* Joint Report, *Jane Doe v. Apple, Inc*., No. 2:26-cv-02178, ECF No. 33 (D. Nev. Aug. 14, 2026) (arguing that "the scope and proportionality of the relevant discovery [in plaintiff's individual case] is far narrower than it was in the putative class action").

This litigation presents one further, unusual feature. Unlike many proposed multidistrict litigations, these actions have already demonstrated the efficiencies that coordinated proceedings provide. The actions originated as a putative class action in the Northern District of California, where for over three years approximately 40 plaintiffs jointly litigated common legal and factual issues concerning Apple's conduct before the claims were severed into individual actions for case-

specific proceedings. That severance has now dispersed substantially identical litigation across the country, while leaving untouched the overwhelmingly common discovery that remains to be completed. Section 1407 exists to prevent precisely this type of duplication.

Accordingly, transfer to the Northern District of California will restore the efficiencies previously achieved through coordinated proceedings while ensuring consistent management of common discovery and pretrial proceedings.

## II. FACTUAL BACKGROUND[4]

### A. Apple's AirTag Ecosystem Gives Rise to Common Factual Questions in Every Action.

Apple introduced AirTag as a Bluetooth-enabled tracking device marketed as a product to help consumers locate personal property through Apple’s proprietary Find My network. The product allows users to attach an AirTag to personal belongings like keys or luggage and determine the tag’s location through hundreds of millions of Apple devices participating in the Find My ecosystem. Prior to the release of AirTag, there were not comparably dangerous stalking tools widely available on the market. GPS trackers were typically expensive, difficult to acquire, hard to conceal, imprecise, and had short battery lives. AirTags, by contrast, are cheap and ubiquitous, easy to conceal within vehicles or personal belongings, and they permit precision tracking not just for a few days but a battery life of up to a year or more.

In 2021, Apple rolled AirTag out with only a rudimentary system for alerting iOS users. But even those alerts were fundamentally flawed. Initially, iOS users being stalked with an AirTag were only warned after three days of tracking. Android or other non-iOS users received no warning at all. Apple eventually updated AirTags to issue warnings after 8-to-24 hours of unwanted tracking and worked with others in the industry to make these alerts available to Android

[4] All of the facts contained in this section are alleged in the complaints of the Responding Plaintiffs.

devices. But this is still far too long a period to protect stalking victims. Moreover, the alerts often do not work, are confusing, and do not permit stalking victims to stop the tracking unless and until they can physically locate and disassemble the AirTag. As a result, thousands of victims have been stalked with AirTags since their release. By April 2024, Apple had already received approximately 40,000 complaints or reports of unwanted tracking.

All plaintiffs in these cases allege being stalked by individuals who used AirTags to track them. Every action challenges the same product. Every plaintiff alleges that Apple's decisions regarding the design of AirTags and its insufficient safeguards rendered the product unreasonably dangerous because Apple knew—or should have known—that AirTags would predictably be used by stalkers and other criminals to track victims without their consent. Plaintiffs further allege that Apple nevertheless proceeded with the product's nationwide launch without implementing reasonable safeguards that would have materially reduced that foreseeable risk. As a direct and proximate result of Apple's actions concerning the AirTag, all of the plaintiffs were injured.

Accordingly, every action will require discovery concerning the same product-development process, the same engineering decisions, the same internal safety analyses, the same pre-release testing, the same evaluation of foreseeable misuse, the same implementation of anti-stalking measures, the same policies concerning unwanted tracking complaints or inquiries, and the same post-launch modifications.

These common factual issues predominate over any plaintiff-specific questions concerning the circumstances of individual stalking incidents.

**B. Procedural History**

The present litigation arises directly from the severance of claims previously litigated together in *Hughes v. Apple, Inc.*, No. 3:22-cv-07668-VC (N.D. Cal.) (the "*Hughes* Action"). The

*Hughes* Action was filed on December 5, 2022, as a putative nationwide class action challenging Apple's design, development, marketing, and distribution of AirTags. Over the next several years, the action proceeded before the Honorable Vince Chhabria in the Northern District of California. During that time, the plaintiffs amended their complaint several times in response to the Court's rulings on Apple's motions to dismiss, adding additional plaintiffs and refining the allegations while continuing to assert common claims arising from Apple's alleged misconduct. The operative complaint—the Third Amended Class Action Complaint filed on November 25, 2024 (ECF No. 101)—ultimately included forty-one individual plaintiffs asserting substantially similar claims arising from the same alleged defects in Apple's AirTag ecosystem.

On March 9, 2026, Judge Chhabria denied the plaintiffs' motion for class certification, explaining that the MDL mechanism appeared to be a "far superior" vehicle for collectively managing the cases. Declaration of Edwin J. Kilpela, Jr. in Support of Response of Interested Party Plaintiffs ("Kilpela Decl.") ¶ 3, Ex. A (Transcript of Proceedings, *Hughes v. Apple Inc.*, No. 3:22-cv-07668-VC (N.D. Cal. Mar. 5, 2026) at 23:10-14). Judge Chhabria reasoned that the common elements among the plaintiffs' claims, as well as any potential state law differences, would be best coordinated using the mass tort device. *Id*. at 18:23–19:11; 24:13-20. Shortly thereafter, the parties stipulated to sever the claims of the forty individual plaintiffs. On April 7, 2026, the Court entered its Severance Order. Kilpela Decl. ¶ 4, Ex. B (the "Severance Order"). Pursuant to that Order, Plaintiff Áine O'Neill remained the sole plaintiff in the *Hughes* Action, while each remaining plaintiff wishing to pursue an individual action was directed to file a separate lawsuit. The Court further required the parties to file related-case notices in both the *Hughes* Action and the newly filed individual actions.

The vast majority of the individual plaintiffs timely filed related actions, and the parties

filed the required related-case notices.[5] Judge Chhabria related the cases on May 21, 2026. ECF Nos. 313-314. Apple then moved under 28 U.S.C. § 1404(a) to transfer each action to what Apple identified as the more convenient forum for that individual plaintiff's claims, typically the district where the plaintiff's stalking incident occurred and where non-party witnesses reside. *See* Kilpela Decl. ¶ 5, Ex. C (Order Granting Motion to Transfer, *O'Neill v. Apple, Inc.*, No. 22-cv-07668-VC (N.D. Cal. July 8, 2026), ECF No. 329) (transferring Plaintiff O'Neill's action to the Central District of California because that district "is where the events underlying this dispute occurred" and "is also likely home to many of the material non-party witnesses"). Those motions were granted, and the resulting transfers produced the dispersal reflected in Movant's Schedule of Actions: nineteen individual actions, arising from the same operative complaint and the same alleged course of conduct, pending in fourteen federal districts across the country.[6] Since severance of the original *Hughes* plaintiffs, at least seven new plaintiffs have filed federal actions against Apple concerning AirTag stalking. At the time of this filing, the undersigned counsel are aware of thirty-two actions pending in twenty-three federal judicial districts, a figure expected to dramatically increase in light of the over 40,000 reports to Apple related to unwanted tracking.

As a result of the Severance Order, what had previously been litigated as a single coordinated proceeding has now become numerous individual actions pending in federal district courts throughout the country. Those actions remain founded upon substantially identical factual allegations concerning Apple's conduct, rely upon the same operative complaint from which they were severed, and will require discovery into the same corporate witnesses, documents, engineering decisions, corporate policies, and product-development history. The severance altered

[5] Six of the original *Hughes* plaintiffs were California citizens and, lacking diversity of citizenship from Apple, filed their individual claims in California Superior Court. Another three of them declined to file individual actions.

[6] Several of the cases identified in Movant's Schedule of Actions have been conditionally dismissed in light of pending settlements and therefore likely will not require consolidation by the JPML.

the procedural posture of the litigation, but it did not diminish the overwhelming commonality of the factual issues that will dominate pretrial proceedings.

Indeed, the severance has now created precisely the type of duplicative litigation that Congress sought to prevent through Section 1407. Unless centralized, courts throughout the country will be required to oversee overlapping discovery, resolve identical legal disputes, and supervise repeated pretrial proceedings involving the same corporate conduct and many of the same witnesses.

## III. LEGAL STANDARD

Section 1407 authorizes the Panel to transfer civil actions involving "one or more common questions of fact" pending in different federal districts to a single district for coordinated or consolidated pretrial proceedings whenever transfer "will be for the convenience of parties and witnesses and will promote the just and efficient conduct of such actions." 28 U.S.C. § 1407(a).

The Panel has consistently recognized that centralization is particularly appropriate where, like here, actions arise from the same alleged course of conduct, will require overlapping discovery, involve common corporate witnesses and documentary evidence, and present a substantial risk of inconsistent pretrial rulings. Centralization eliminates duplicative discovery, conserves judicial resources, reduces litigation costs, prevents conflicting decisions on recurring issues, and promotes consistent management of complex litigation. *See, e.g., In re T-Mobile 2022 Customer Data Sec. Breach Litig.*, 677 F. Supp. 3d 1366, 1366-1367 (J.P.M.L. 2023); *In re: Carrier IQ, Inc., Consumer Privacy Litigation*, 856 F. Supp. 2d 1332, 1333 (J.P.M.L. 2012); *In re: Blackbaud, Inc., Customer Data Security Breach Litigation*, 509 F. Supp. 3d 1362, 1364 (J.P.M.L. 2020).

The Panel has likewise recognized that centralization is appropriate even where individual

plaintiffs assert different injuries or proceed under the laws of different states, provided that common factual issues predominate during pretrial proceedings. *See, e.g., In re Cook Med., Inc., IVC Filters Mktg., Sales & Practices & Prods. Liab. Litig*., 53 F. Supp. 3d 1379, 1381 (J.P.M.L. 2014) ("The Panel has rejected the argument that products liability actions must allege identical injuries to warrant centralization."); *see also In re Helicopter Crash in Germany*, 443 F. Supp. 447, 449 (J.P.M.L. 1978) ("[A]lthough various actions may raise legal issues regarding application of the law of different states, this is an insufficient ground for denying transfer of this litigation under Section 1407 since such issues can be presented to and resolved by the transferee judge."). Differences in individual causation, damages, or state-law issues rarely outweigh the efficiencies gained by coordinated discovery relating to a defendant's uniform conduct. The relevant inquiry is not whether every issue is common, but whether common factual questions are sufficiently substantial that coordinated pretrial management will materially advance the litigation.

Those principles apply with particular force here.

## IV. ARGUMENT

### A. The Actions Present Extensive Common Questions of Fact.

The threshold requirement for centralization under Section 1407 is easily satisfied because every pending action challenges the same product, the same course of corporate conduct, and the same alleged design decisions by Apple resulting in AirTags' ubiquity as a stalking tool.

Although the plaintiffs experienced different stalking incidents at different times and in different locations, none of those individualized facts alter the reality that every case will require resolution of substantially identical questions concerning Apple's conduct and its product notwithstanding any plaintiff-specific issues that may exist.

At the center of every action is the same fundamental question: Is Apple liable for its design

and distribution of AirTags in light of the foreseeable and avoidable risk that the product would be used as an instrument of stalking and location-based abuse? Resolution of that question will require discovery into the same corporate departments, the same decisionmakers and company witnesses, and a substantially identical documentary record in every case.

**1. Every Action Challenges the Same Design Decisions**

Each plaintiff alleges that Apple's liability arises from uniform design choices made during the development and sale of AirTag, both leading up to its release and over the past five years as incidents of AirTag stalking have continued unabated despite Apple's ability to improve the product both through hardware changes and over-the-air software updates. Accordingly, every case will require discovery concerning:

- the conception and development of AirTag;
- the hardware and software architecture of the Find My network;
- Apple's decisions regarding unwanted tracking alerts and other anti-stalking features for iOS and non-iOS users;
- Apple's testing of its anti-stalking features;
- software updates and other post-launch modifications;
- hardware and software changes with the AirTag 2; and
- alternative designs considered by Apple.

These issues do not materially vary from plaintiff to plaintiff. The relevant evidence resides with Apple and concerns decisions made by Apple's engineers and executives concerning every AirTag sold in the United States, including each and every AirTag purchased by the individuals who stalked the plaintiffs.

**2. Every Action Requires Discovery into Apple's Knowledge and Policies for Dealing with Stalking Victims and Law Enforcement.**

Each plaintiff likewise alleges that Apple knew, or should have known, before and after launch, that AirTags would be misused for stalking and location tracking. Consequently, discovery in every case will encompass substantially identical evidence concerning:

- Apple's internal risk assessments;
- reports of stalking incidents;
- communications with law enforcement;
- communications with advocacy organizations;
- internal safety reviews;
- customer complaints;
- media reports;
- development of anti-stalking updates;
- Apple's response to recurring reports of criminal misuse; and
- Apple's failure to assist stalking victims attempting to stop their stalkers.

Whether Apple possessed such knowledge, and what Apple did in response, will be litigated identically across every action.

**3. The Same Corporate Witnesses Will Be Deposed Repeatedly.**

The overlap in party discovery independently justifies centralization. Absent transfer, Apple's engineers, product managers, safety personnel, marketing employees, software developers, and Rule 30(b)(6) witnesses will face repetitive depositions in district courts across the country concerning the same subjects. Likewise, the same custodial documents, electronically stored information, source-code repositories, engineering records, testing materials, executive communications, marketing documents, and safety analyses will be requested repeatedly.

The duplication is not hypothetical—it is inevitable. Every plaintiff seeks discovery into the same product-development process and the same corporate decision-making. Without coordinated proceedings, numerous courts will supervise substantially identical discovery disputes involving identical custodians, identical document requests, identical privilege issues, and identical protective-order questions.

Centralized management before one court is the mechanism Congress created to avoid it.

**4. Apple's Section 1404(a) Transfers Confirm, Rather Than Eliminate, the Need for Centralization.**

The dispersal reflected in the Related Actions is itself the product of Apple's own motions

to transfer venue under 28 U.S.C. § 1404(a). Those motions addressed only the convenience of the parties and certain non-Defendant witnesses in each individual action—for example, the location of the alleged stalking incident and the residence of non-party witnesses—not the common corporate-conduct discovery that predominates across every action. *See* Kilpela Decl. ¶ 5, Ex. C (transferring venue based on where "the events underlying this dispute occurred" and the location of non-party witnesses, without reference to Apple's design, safety, or corporate-knowledge evidence). They did not, and could not, address the duplicative discovery and inconsistent-ruling risks that arise once the same common questions must be litigated separately in twenty-three different judicial districts. Section 1404(a) and Section 1407 serve different purposes, and a transfer of venue for individual convenience is no substitute for centralized pretrial management of common issues. If anything, the fact that Apple's own venue motions produced this exact dispersal underscores why centralization is now necessary.

### B. Centralization Will Eliminate the Risk of Inconsistent Pretrial Rulings.

Absent centralization, district courts throughout the country will confront the same recurring pretrial issues arising from the same alleged conduct by Apple. Those courts will necessarily be required to decide overlapping legal questions concerning discovery, privilege, expert testimony, Rule 12 and dispositive motions, and other motions concerning the scope of the claims while supervising substantially identical factual development. The resulting risk of inconsistent rulings is substantial.

For example, absent consolidation, numerous individual trial courts would be required to determine the permissible scope of discovery concerning Apple's internal product-development process, safety analyses, engineering documents, communications regarding stalking reports, software development, corporate policies, and post-launch modifications. Courts likewise may be

asked to resolve identical disputes concerning custodial discovery, electronically stored information, privilege assertions, confidentiality designations, source-code production, Rule 30(b)(6) testimony, expert discovery, and the admissibility of common scientific and technical evidence.

The substantial risk of inconsistent pre-trial discovery rulings is actual, not hypothetical. Apple has already signaled that it intends to raise issues in the individual actions taking advantage of the lack of nationwide coordination to argue that each individual plaintiff's need for discovery from Apple must be limited by proportionality from the standpoint of each individual case, ignoring the dozens of similar claims. *See* Kilpela Decl. ¶ 6, Ex. D (Joint Report, *Jane Doe v. Apple, Inc*., No. 2:26-cv-02178, ECF No. 33 (D. Nev. Aug. 14, 2026)) (arguing that "the scope and proportionality of the relevant discovery here is far narrower than it was in the putative class action"). Consolidation will allow the necessary discovery to be conducted on a coordinated basis to the benefit of each individual case and will avoid inconsistent rulings regarding the proper scope of such discovery, without exposing Apple to disproportionate costs and effort.

Dispositive and Rule 12 motions likewise will substantially overlap. Although each plaintiff's individual circumstances differ, Apple is expected to advance many of the same threshold legal defenses across the litigation, including challenges concerning duty, breach, foreseeability, product defect issues like feasible alternative designs, causation, superseding criminal conduct, and other issues arising from Apple's uniform design and marketing decisions. Allowing multiple courts to resolve those recurring issues risks inconsistent rulings that would undermine the efficient administration of justice.

The Panel has repeatedly recognized that Section 1407 exists precisely to avoid such duplication and inconsistency. Centralization enables a single court to supervise coordinated

discovery, resolve common pretrial disputes consistently, and establish uniform procedures governing recurring issues. Those efficiencies are particularly important where, as here, the litigation centers upon a single product and a defendant's uniform course of conduct.

The risk of inconsistent rulings is especially acute because many of the principal legal issues will arise before any plaintiff-specific discovery becomes relevant. Questions concerning Apple's corporate knowledge, the reasonableness of its design decisions, the adequacy of its safety measures, the discoverability of its internal documents, and the scope of expert testimony are common to every pending action. Resolving those issues once, rather than repeatedly across numerous jurisdictions, will materially advance every case while preserving judicial resources.

### C. Centralization Will Conserve Judicial Resources and Eliminate Duplicative Proceedings.

Transfer under Section 1407 will also conserve the resources of the federal judiciary by preventing multiple courts from supervising identical pretrial proceedings. Without centralization, each district court will independently establish discovery schedules, adjudicate protective-order disputes, oversee document production, resolve privilege questions, supervise expert discovery, and conduct repeated hearings concerning substantially identical issues. That duplication will impose unnecessary burdens not only on the parties but also on the numerous federal courts in which the current and future-filed actions would be litigated.

The burden on Apple and third-party witnesses likewise would be considerable. Apple's engineers, product managers, software developers, safety personnel, marketing employees, and corporate representatives would face repeated depositions across multiple jurisdictions concerning the same decisions and the same documentary record. Likewise, counsel would repeatedly brief identical legal issues before different judges applying different scheduling orders and local rules.

Centralization eliminates those inefficiencies by allowing one court to supervise

coordinated discovery, establish uniform pretrial procedures, and resolve recurring issues on a litigation-wide basis. Individual issues concerning causation and damages—which themselves will present common legal issues that can be adjudicated on a litigation-wide basis—can thereafter proceed in the transferor courts following completion of coordinated pretrial proceedings, consistent with the purpose of Section 1407. As this Panel has previously found, "[s]uch differences have not been an impediment to centralization in the past." *In re: Uber Tech., Inc., Passenger Sexual Assault Litig.*, 699 F. Supp. 3d 1396, 1398 (J.P.M.L. 2023) (quoting *In re Wright Med. Tech., Inc., Conserve Hip Implant Prods. Liab. Litig.*, 844 F. Supp. 2d 1371, 1372 (J.P.M.L. 2012)).

This litigation illustrates precisely why Congress enacted the multidistrict litigation statute. The actions concern one product, one defendant, one body of corporate conduct, one principal universe of documentary evidence, and one set of recurring legal and factual issues. Requiring numerous courts to replicate the same pretrial work would produce needless expense while offering no corresponding benefit.

### D. The Procedural History of the *Hughes* Action Confirms That Coordinated Proceedings Are Necessary.

The procedural history of the *Hughes* Action provides an unusual and compelling reason for transfer. Unlike many proposed multidistrict litigations, the need for coordinated proceedings is not speculative. It has already been demonstrated through several years of litigation before a single district judge.

For more than three years, the *Hughes* Action proceeded as a putative class action involving numerous named plaintiffs, asserting substantially identical allegations concerning Apple's design, development, marketing, and sale of AirTags. During that period, the Northern District of

California court resolved motions to dismiss, supervised discovery,[7] addressed extensive disputes regarding confidential information, entered a Stipulated Protective Order (ECF No. 124) and ESI Protocol (ECF No. 134), and presided over class-certification proceedings. The court therefore gained extensive familiarity with the technical operation of AirTags, the Find My network, Apple's internal decision-making, and the common factual issues that permeate every plaintiff's claims. In addition, Apple has responded to substantial discovery in the *Hughes* Action and produced over 285,000 pages of documents.

At the class-certification hearing, Judge Chhabria expressly recognized that the litigation had evolved into what he described as "a mass tort." Transcript of Proceedings, *Hughes v. Apple Inc.*, No. 3:22-cv-07668-VC (N.D. Cal. Mar. 5, 2026) at 20:9. Plaintiffs similarly acknowledged that the case had become "much more like a mass tort and something that is MDL'd." *Id.* at 19:12-18. Judge Chhabria further observed that, had these actions proceeded as individual cases from the outset, "the cases presumably would have been put in front of one judge for pretrial purposes," explaining that "[l]et's say it's an MDL, right? The judge could have decided the issue of duty and breach, and it would have applied to all of the plaintiffs." *Id.* at 18:23–19:11. Those observations reflect precisely the efficiencies Congress intended Section 1407 to achieve. Indeed, Judge Chhabria repeatedly contrasted continued class-action proceedings with coordinated mass-tort management, explaining that "the MDL mechanism, or if all cases are within the district, you know, a mini MDL within the district ... seems like a far superior mechanism for adjudicating the cases." *Id.* at 23:10–24:20.

[7] In addition to Judge Chhabria's familiarity with the case, it should be noted that Magistrate Judge Thomas S. Hixson has an equally extensive understanding of the parties and the main issues that underly their discovery disputes. Judge Hixson has issued nine orders, to date, and had pending letter briefing before him at the time the initial cases were severed. His experience with this litigation would be lost, should these cases get consolidated outside of the Northern District of California.

Following denial of class certification, the court entered the Severance Order requiring the individual plaintiffs to file separate actions. The severance changed only the procedural posture of the litigation. It did not alter the common factual nucleus underlying every case. The same discovery remains to be completed. The same Apple witnesses remain to be deposed. The same engineering documents remain relevant. The same expert testimony will be required. And the same recurring legal questions concerning Apple's conduct will continue to arise.

The severance therefore created the very duplication that coordinated proceedings are designed to eliminate. Rather than allowing dozens of courts to reconstruct the same pretrial record independently, Section 1407 permits that work to occur once before a single transferee court.

Judge Chhabria recognized the efficiencies that coordinated management would provide, offering—discussed further below—to have the individual actions related back to him rather than scattered among 10 or 15 different judges in the district. That offer, made by the judge who has presided over this litigation for almost four years, confirms what the procedural history already demonstrates: these actions are best managed through coordinated pretrial proceedings before a single court familiar with the common factual and legal issues.

The present motion therefore does not ask the Panel to predict whether coordinated proceedings might prove beneficial. The history of this litigation already answers that question. The only remaining issue is whether those efficiencies should now be restored through formal multidistrict proceedings.

## V. THE NORTHERN DISTRICT OF CALIFORNIA IS THE APPROPRIATE TRANSFEREE DISTRICT.

The same considerations demonstrating that these actions should proceed through coordinated pretrial proceedings also identify the Northern District of California as the appropriate transferee forum. That District has already served as the focal point of this litigation for more than

three years: Apple is headquartered there, the overwhelming majority of relevant corporate witnesses and documents are located there, and Judge Chhabria has already devoted substantial judicial resources to understanding the AirTag ecosystem and the common factual issues that underlie every pending action.

First, Apple is headquartered in Cupertino, California, within the Northern District of California. The overwhelming majority of corporate witnesses, relevant custodians, electronically stored information, engineering records, product-development documents, and decisionmakers are located within or near the District. Discovery concerning AirTag's conception, development, testing, marketing, software architecture, and post-launch modifications therefore will naturally be centered there.

Second, the Northern District of California has already devoted substantial judicial resources to the underlying litigation. For more than three years, the *Hughes* Action proceeded before the Honorable Vince Chhabria, who resolved multiple motions to dismiss, supervised extensive discovery, addressed complex sealing disputes, presided over class-certification proceedings, and became intimately familiar with both the factual allegations and the technical operation of AirTag and the Find My network. Reassigning coordinated proceedings elsewhere would unnecessarily duplicate that investment of judicial resources.

Third, the procedural history of the *Hughes* Action itself demonstrates why the Northern District of California is uniquely positioned to manage this litigation. During the class-certification hearing, Judge Chhabria independently observed that the litigation had evolved into what "looks a lot like ... an MDL" and repeatedly compared the actions to a mass tort requiring coordinated management rather than continued class-action proceedings. Kilpela Decl. ¶ 3, Ex. A at 20:6–9. Judge Chhabria further recognized that the individual actions would continue to share substantial

common issues concerning duty, breach, and Apple's conduct, observing that those issues ordinarily could be resolved in coordinated pretrial proceedings before a single judge. *Id.* at 18:23–19:11. Similarly, he reasoned, based on his experience overseeing other multidistrict litigation, that the similarities and differences between state tort laws could be effectively managed through the mass tort device. *Id*. at 24:13-20.

Finally, Judge Chhabria expressly stated that, if the individual actions remained in the Northern District following severance, he would "certainly volunteer" to have all of the cases related to him so "there's not this inefficient process of 10 or 15 different judges in the district adjudicating these cases." *Id.* at 36:6–15. Although the ultimate decision regarding transfer rests exclusively with this Panel, Judge Chhabria's remarks underscore two important realities: first, that these actions will benefit from coordinated pretrial management; and second, that maintaining coordinated proceedings before a judge already familiar with the litigation would avoid needless duplication of judicial effort.

By contrast, the moving party's pending case in the District of Arizona is in its infancy. *See* ECF 1-1 at 2, n.2 (acknowledging that Jane Doe S.B. 1 had not even had a judge or case number assigned). The sole former-*Hughes* Plaintiff's case pending there was only recently transferred to the District of Arizona and assigned to Judge Humetawa. *Doe v. Apple, Inc.*, No. 2:26-cv-05261-DJH, ECF Nos. 22-24 (D. Ariz.). Thus, Judge Humetawa has far less familiarity with the case compared with Judge Chhabria. Moreover, that case has settled in principle and is unlikely to proceed any further. Kilpela Decl. ¶ 7.

For all of these reasons, the Northern District of California—and specifically assignment to Judge Chhabria, should the Panel deem appropriate—would best serve the convenience of the parties and witnesses and promote the just and efficient handling of this litigation.

## VI. CONCLUSION

For the above reasons, Responding Plaintiffs request the Related Actions be transferred and consolidated before the Honorable Vince Chhabria, United States District Judge for the Northern District of California.

Dated: August 26, 2026

Respectfully submitted,

*/s/ Edwin J. Kilpela, Jr.*

**WADE KILPELA SLADE LLP**
Gillian L. Wade, State Bar No. 229124
gwade@waykayslay.com
Sara D. Avila, State Bar No. 263213
sara@waykayslay.com
Collins Kilgore, State Bar No. 295084
ckilgore@waykayslay.com
Marc A. Castaneda, State Bar No. 299001
marc@waykayslay.com
2450 Colorado Ave.
Suite 100E
Santa Monica, CA 90404

**WADE KILPELA SLADE LLP**
Edwin J. Kilpela, Jr.
ek@waykayslay.com
Paige Noah
pnoah@waykayslay.com
James Lamarca
jlamarca@waykayslay.com
6425 Living Pl. Suite 200
Pittsburgh, PA 15206

**WADE KILPELA SLADE LLP**
David Slade
slade@waykayslay.com
Brandon Haubert
brandon@waykayslay.com
Jake Windley
jake@waykayslay.com
1 Riverfront Place
Suite 745
North Little Rock, AR 72114

**DICELLO LEVITT LLP**
Mark A. DiCello
madicello@dicellolevitt.com
Kenneth P. Abbarno
kabbarno@dicellolevitt.com
Justin J. Hawal
jhawal@dicellolevitt.com
8160 Norton Parkway, Third Floor
Mentor, OH 44060

*Attorneys for Responding Plaintiffs*